UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

UNITED STATES OF AMERICA,

        Plaintiff,                        Case No. 13-cr-20832

v                                     Honorable Thomas L. Ludington

KEVIN JAMES LIJEWSKI,

        Defendant.

_____/

**ORDER GRANTING IN PART AND DENYING IN PART
DEFENDANT'S MOTION TO SUPPPRESS**

On November 13, 2013, Defendant Kevin James Lijewski was charged with four violations of the National Firearms Act and two counts of possession of an unregistered firearm. On March 19, 2014, Lijewski filed a motion to suppress three firearms that were seized from his business during the execution of a search warrant. Lijewski asserts that the affidavit supporting the warrant lacked probable cause and that the plain view exception does not apply to the firearms.

On June 3, 2014, the Court conducted a hearing regarding Lijewski's motion to suppress. Two ATF agents, John Murphy and Misty Moran, testified at the hearing, and at the conclusion of the hearing the Court invited Lijewski to file a supplemental brief. On June 12, 2014, Lijewski filed a supplemental brief that provided details concerning a 2012 ATF compliance check.

Although the warrant is supported by probable cause, the firearms at issue here were not covered by the warrant. One of the firearms, the Stag Arms shotgun, is subject to the plain view exception and will not be suppressed. However, the other two firearms—the Stag Arms rifle and

the Sten Gun machine gun parts kit—are not subject to the plain view exception and will be suppressed.

## I

The search of Lijewski's gun store was a result of an investigation by Bay City law enforcement into allegations of Lijewski's sexual misconduct. On March 22, 2013, an officer with the Bay City Public Safety Department interviewed B.H., who related the events that occurred three months prior, in December 2012. At that time, B.H. was 15 years old and working odd jobs in Lijewski's gun store, Gunrunners. B.H. claims that Lijewski made him have oral and anal sex in the store. That same day, the officer also spoke with Tyler Schmidt, who claims that Lijewski held him against his will in Lijewski's apartment.

On April 10, 2013, B. H. was interviewed at the Children's Advocacy Center in Bay City regarding his allegations against Lijewski. During the interview, B.H. claimed that he was sexually assaulted in Lijewski's apartment. He explained that Lijewski raped him in the apartment during a party sometime around Christmas. Lijewski had provided B.H. with marijuana and they smoked it together. During the incident, Lijewski locked the bedroom door and placed his .45 caliber handgun on the table. Lijewski told B.H. "that he wasn't allowed to leave and to get back in the bed." Affidavit 2. B.H. also stated that Lijewski had cameras throughout his apartment, and that Lijewski carries a laptop between his apartment and his gun store. B.H. states that, at Lijewski's store, Lijewski "rubb[ed] his back or inner thigh in a manner that freaks [B.H.] out." Mot. Suppress 2.

That same day, Tyler Schmidt was also interviewed at the Children's advocacy Center. Mr. Schmidt explained that Lijewski has cameras all over his apartment that record to DVRs and that he has a laptop computer that he carries with him back and forth to the gun shop and the

apartment. Mr. Schmidt also noted that Lijewski "frequently carries a 45 caliber handgun." Affidavit 2.

### A

Based on these interviews, Detective Roberts of the Bay City Police Department requested a warrant to search Lijewski's gun shop for a .45 caliber handgun, drug paraphernalia, and digital information stored on computers, hard drives, flash drives, CDs, or DVDs. In addition to describing the alleged criminal sexual conduct outlined above, Detective Roberts also included the following information:

> I know from this investigation and previous investigations that Kevin Lijewski's residence is an apartment approximately 3 blocks from the location described in paragraph three, and I have seen Lijewski travel to and from his apartment to his place of business on multiple occasions. I know that Kevin Lijewski's place of business is a gun shop, and that he is the sole proprietor.
>
> I know from my training and experience that persons who engage in Criminal Sexual Conduct involving juveniles will sometimes supply the victim with drugs and/or alcohol in an effort to lower the victim's inhibitions regarding the sexual act, and that when one type of controlled substance is found, other controlled substances are frequently found. I know that subjects can and occasionally will store controlled substances such as marijuana and/or any other controlled substances or drug paraphernalia at their place of business when they are the sole proprietor. I know that persons who have digital recording devices such as DVRs can and occasionally will store video segments and still images on various devices such as laptop computers, portable digital storage devices such as flash or zip drives, external hard drives, CDs and DVDs, or other digital storage devices, and that these items can be easily transported to their place of business. I know that digital information can be transferred and/or stored on available computers at a person's place of business. I know that a person who operates a gun shop frequently has a secure storage container on the premises such as a safe to store handguns or other weapons, and that the subject can and occasionally will secure personal items including handguns inside the secure container.

Affidavit 3. The magistrate judge signed the warrant on May 8, 2013.

**B**

The next day, on May 9, 2013, Bay City law enforcement executed the warrant and search of Lijewski's gun shop. In addition to the Bay City police officers, two special agents and two industry operations investigators participated in the search.

During the search for the laptop, marijuana, and .45 caliber pistol, the officers began inspecting four other firearms in the shop. Three of these four firearms were determined by law enforcement to be illegal firearms and form the basis of the indictment.

The first, a Stag Arms model 775A shotgun ("the shotgun") was brought to the attention of ATF Agent John Murphy by a member of the Bay City Police Department. The shotgun was in a rack visible behind the counter of the store. Agent Murphy testified that, based on his visual observation of the shotgun in the rack, the barrel length appeared to be too short to comply with federal guidelines. Therefore, another ATF agent removed the shotgun from the rack, inserted a dowel rod into the barrel, and used a tape measure to measure the length of the barrel. The agent determined that the shotgun barrel measured 14.5 inches—thereby confirming that the shotgun barrel did not comply with federal law requiring a minimum of 18 inches.

After discovering the first shotgun, Agent Murphy testified that he suspected there may be other illegal firearms in the store. Agent Murphy noticed another firearm, the Stag Arms Model Stag-15, 556 caliber ("the rifle"), in a gun rack behind the counter. Agent Murphy testified that upon visually inspecting the rifle, he could not determine whether the rifle barrel length met the legal requirement. He therefore removed the rifle from the gun rack to examine it. He first investigated whether the barrel was detachable by twisting the barrel. Upon discovering

that the rifle barrel was detachable, he then measured the barrel length without the attachment. Measuring the barrel confirmed that the barrel was too short.[1]

The third firearm was a Sten Gun machine gun parts kit that included various unattached pieces in a plastic bag. Agent Murphy discovered the plastic bag underneath a workbench in the store. Because it was dark underneath the workbench, Agent Murphy removed the plastic bag and looked at its contents. He testified that, by removing some parts from the bag and by holding the bag up to the light, he noticed a cut-out template in the bag, which he knew—through his training—could indicate the existence of a machine gun. Agent Murphy therefore removed the template from the bag, took photographs of the template, and electronically sent the photographs to his contact at the Firearms Technology Branch, who confirmed that the plastic bag contained a machine gun.

Finally, law enforcement seized a Browning Machine Gun model M1919A4, which was also suspected of being a machine gun. Law enforcement officers forwarded the gun to the ATF Firearms Technology Branch, where testing determined that the firearm was not a machine gun.

**C**

As a result of the search of his shop and the seizure of the firearms, Lijewski was charged with violations of the National Firearms Act and three counts of possession of an unregistered firearm. The charges stemmed from Lijewski's possession of the shotgun, the rifle, and the machine gun (which was assembled from the Sten Gun kit).

---

[1] Agent Murphy further testified that an agent may have measured the length of the rifle barrel with the attachment, but he could not recall what that measurement was. Lijewski represents that the length of the rifle barrel with the attachment complies with federal requirements.

**II**

Lijewski challenges the legality of the search of his gun shop. He contends that the warrant is not supported by probable cause, and that the seized guns were not subject to the plain view exception.

The Fourth Amendment provides that "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched and the persons or things to be seized." U.S. Const. amend. IV. The Fourth Amendment requires that probable cause be determined by a "neutral and detached magistrate." *Johnson v. United States*, 333 U.S. 10, 14 (1948). The affidavit that the magistrate reviews "must contain adequate supporting facts about the underlying circumstances to show that probable cause exists for the issuance of the warrant." *United States v. Smith*, 182, F.3d 473, 477 (6th Cir. 1999). "Probable cause is defined as reasonable grounds for belief, supported by less than prima facie proof but more than mere suspicion." *United States v. Bennett*, 905 F.2d 931, 934 (6th Cir. 1990). In determining whether probable cause exists, a magistrate must look at the "totality of the circumstances." *Illinois v. Gates*, 462 U.S. 213, 232 (1983).

The Sixth Circuit instructs the reviewing court to "accord the magistrate's determination great deference." *United States v. Allen*, 211 F.3d 970, 973 (6th Cir. 2000) (internal citations omitted). A "magistrate's discretion should only be reversed if it was arbitrarily exercised." *Id.*

**A**

Lijewski claims that the warrant lacks probable cause because it failed to establish a nexus between the criminal activity, criminal sexual conduct, and the place to be searched, Lijewski's gun store. When a warrant application seeks to search a particular location, the affidavit must establish a sufficient "nexus between the place to be searched and the evidence to

be sought." *United States v. Brooks*, 594 F.3d 488, 492 (6th Cir. 2010) (internal quotations omitted). It is not enough that the owner of the property is suspected of a crime; rather, the affidavit must show reasonable cause to believe that contraband sought will be found in the property to be searched. *Id.* The Sixth Circuit has consistently held that a nexus can be inferred based on the nature of the evidence sought and the type of offense that the defendant is suspected of committed. *See, e.g., United States v. Gunter*, 551 F.3d 472, 481 (6th Cir. 2 009).

The question of whether the affidavit established a nexus between the items sought—a gun, a laptop, and drugs—and Lijewski's shop is close. Yet reading the affidavit as a whole, and based on the totality of the circumstances, the affidavit sets forth sufficient facts to meet the nexus requirement.

First, the affidavit provided independent corroborating evidence that Lijewski was suspected of having engaged in the criminal activity for which evidence was sought. *See United States v. McPhearson*, 469 F.3d 518, 524 (6th Cir. 2006) ("[I]ndependently corroborated facts" can create an inference by which a magistrate can conclude that there is a sufficient nexus between the criminal activity and the place to be searched.). Agent Roberts explains that the victim disclosed that "Kevin Lijewski had anal and oral sex with him on or about the last week of December 2012 at Lijewski's apartment on Midland Street." Affidavit 2. At that time, Lijewski provided marijuana to the victim and "then placed his 45 caliber handgun on the table while telling [the victim] that he wasn't allowed to leave." *Id*. The victim also alleged that Lijewski had cameras throughout his apartment that were capable of recording the events taking place. The search warrant seeks those pieces of evidence allegedly used during the commission of the sexual crime: marijuana, a .45 handgun, and digital recording and storage devices. The search warrant thus provides corroborating evidence, in the form of statements by two

individuals, that Lijewski is suspected of having engaged in the criminal activity for which the evidence is sought.

Second, the affiant noted that the evidence sought is the type of evidence that Lijewski could store at his gun shop—where he was sole proprietor. Both the victim and another witness established that Lijewski "owns an unknown brand laptop computer that he uses at his apartment and his place of business." Affidavit 2 (witness "said that Lijewski carries a laptop and a portable digital storage device with him."). Lijewski's gun shop is located approximately three blocks from his apartment, and the affiant personally observed Lijewski "travel to and from his apartment to his place of business on multiple occasions." Affidavit 3.

In addition, the affiant averred that the type of evidence sought "can and occasionally will"[2] be stored at a defendant's sole proprietorship:

> I know that subjects can and occasionally will store controlled substances or drug paraphernalia at their place of business when they are the sole proprietor. I know that persons who have digital recording devices such as DVRs can and occasionally will store video segments and still images on various devices such as laptop computers . . . and that these items can be easily transported to their place of business. I know that a person who operates a gun shop frequently has a secure storage container on the premises such as a safe to store handguns or other weapons, and that the subject can and occasionally will secure personal items including handguns inside the storage container.

Affidavit 3. The affiant bases his knowledge on his 15 years of experience as a member of the Bay City Police Department. The Sixth Circuit has held that a judge may give "considerable weight to the conclusion of experienced law enforcement officers regarding where evidence of a crime is likely to be found and is entitled to draw reasonable inferences about where evidence is

---

[2] Lijewski contends that the affiant's hedging, demonstrated by his use of "can and occasionally will", means that this Court should not defer to his expertise. However, the Sixth Circuit has concluded that a Court may rely on an affiant's opinions and training even when the affiant uses uncertain language. *See Caicedo*, 85 F.3d at 1193 ("Despite the affidavit's use of 'could be' and 'may be,' the affidavit established that Sergeant Bogenschutz, the affiant, had 15 years' experience in law enforcement generally . . .we find it was reasonable to defer to the attesting officer's expertise and that the affidavit adequately established probable cause to search.").

likely to be kept, based on the nature of the evidence and the type of offense." *United States v. Caicedo*, 85 F.3d 1184, 1192 (6th Cir. 1996). Given the deference accorded to the experience of law enforcement officers, the portability and nature of the items sought, and the proximity of Lijewski's business to his apartment, the affidavit adequately established probable cause to search.

**B**

Although the foregoing addresses Lijewski's probable cause challenge, the Government's alternative good faith argument will also be briefly addressed. Lijewski argues that the affidavit submitted to obtain the warrant was "so lacking in indicia of probable cause" that no reasonable officer could have relied on it in good faith. Mot. to Suppress at 11 (citing *United States v. Laughton*, 409 F.3d 744, 748 (6th Cir. 2005).

"[T]he exclusionary rule does not apply when the police conduct a search in 'objectively reasonable reliance' on a warrant later held invalid." *Davis v. United States*, 131 S. Ct. 2419, 2428 (2011). Indeed, "only in exceptional circumstances is law enforcement to disregard a magistrate judge's authorization." *United States v. Evers*, 669 F.3d 645, 654 (6th Cir. 2012). The Sixth Circuit has identified only four circumstances in which the good faith exception does not apply:

> (1) where the issuing magistrate was misled by information in an affidavit that the affiant knew was false or would have known was false except for his reckless disregard for the truth; (2) where the issuing magistrate wholly abandoned his judicial role and failed to act in a neutral and detached fashion, serving merely as a rubber stamp for the police; (3) where the affidavit was nothing more than a "bare bones" affidavit that did not provide the magistrate with a substantial basis for determining the existence of probable cause, or where the affidavit was so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable; and (4) where the officer's reliance on the warrant was not in good faith or objectively reasonable, such as where the warrant is facially deficient.

*United States v. Higgins*, 557 F.3d 381, 391 (6th Cir. 2009).

Lijewski relies on the third exception—the lack of probable cause—to suggest that no reasonable officer could have relied on the warrant. However, given this Court's finding that the affidavit provides sufficient information to support a finding of probable cause, the officers' reliance on the affidavit could not have been "entirely unreasonable." Accordingly, the good faith exception precludes application of the exclusionary rule.

**II**

Lijewski argues that, even if the warrant is supported by probable cause, the guns seized during the search should be suppressed because they were not authorized by the search warrant. Although the only firearm covered by the search warrant was a .45 handgun, the agents also seized a rifle, a shotgun, and a machine gun. The Government responds that the rifle, shotgun, and machine gun are admissible because they were in plain view to the officers executing the search warrant.

Unless an exception applies, a warrant is generally required to permit law enforcement officers to search a place or seize an item. *United States v. McLevain*, 310 F.3d 434, 438 (6th Cir. 2002). The Government concedes that the warrant in this case did not authorize the search for or seizure of a shotgun, rifle, or machine gun. *See* Resp. at 9.

The plain view doctrine is an exception to the warrant requirement. *Horton v. California*, 496 U.S.128, 134 (1990). "It is well established that under certain circumstances the police may seize evidence in plain view without a warrant." *Coolidge v. New Hampshire*, 403 U.S. 443, 465 (1971). Four factors must be satisfied for the plain view doctrine to apply: (1) the object must be in plain view; (2) the officer must be legally present in the place from which the object can be plainly seen; (3) the object's incriminating nature must be immediately apparent; and (4) the

officer must have a right of access to the object. *United States v. Garcia*, 496 F.3d 495, 508 (2007). Lijewski contends that the third factor—the immediately-apparent incriminating nature of the guns—was not satisfied when the officers seized the firearms from his business.

Regarding the third factor, the Sixth Circuit has explained that "[b]ecause the plain view doctrine supplants the need for a particularized warrant, the 'immediately apparent' requirement is necessary to prevent officers from using the plain view doctrine as a means to extend a particularized search authorized by the Fourth Amendment principles into an unlawful exploratory search." *Garcia*, 496 F.3d at 510.

To determine whether the "immediately apparent" requirement is met, a court should include several factors, including: (1) the nexus between the seized object and the items particularized in the warrant; (2) whether the intrinsic nature or appearance of the object gives probable cause to believe it is associated with criminal activity; (3) whether the officer, at the time of the discovery of the object and with the facts then available, can determine probable cause of the object's incriminating nature; and (4) whether the officer can recognize the incriminating nature of the object as the result of his instantaneous sensory perception, as opposed to further investigation. *Garcia*, 496 F.3d at 510. "Probable cause does not require knowledge that the evidence is contraband." *United States v. Carmack*, 426 F. App'x 378, 382 (2011). Instead, it requires that the available facts would warrant a man of reasonable caution in the belief that it may be contraband. *Id.*

**A**

Here, the first factor—nexus between the seized items and the items particularized in the search warrant—weighs against a finding that the weapons' criminality was immediately apparent. There was no nexus between the firearms seized and the handgun, marijuana, or digital

recording devices authorized in the warrant. Nothing in the warrant or the affidavit suggests that Lijewski used the short-barrel guns or a machine gun during the alleged sexual assault. Indeed, there is no evidence that the guns were seized because of any connection with the alleged assault at all—they were seized because officers believed the barrels were too short or that the plastic bag contained machine gun parts. Because there is no nexus between the guns seized and the items specified in the warrant, this factor weighs against a finding that the guns' criminality was immediately apparent.

## B

The analysis of the second factor is more nuanced. The Court must examine each item recovered—a short-barrel rifle, a short-barrel shotgun, and a machine gun—to determine whether the "intrinsic nature or appearance of the object" gives probable cause to believe it is associated with criminal activity.

### i

First, with regard to the two short-barrel firearms, the Sixth Circuit has repeatedly held that the incriminating nature of sawed-off shotguns is immediately apparent. *Carmack*, 426 F. App'x at 383 (collecting cases); *United States v. Truitt*, 521 F.2d 1174, 1177 (6th Cir. 1975); *United States v. Wade*, 30 F. App'x 368, 369 (6th Cir. 2002).

Although the Sixth Circuit has remained rather static in its holdings that sawed-off shotguns have an immediately apparent criminal nature, the cases all involved sawed-off firearms that were much shorter than legal firearms. *See Carmack*, 426 F. App'x at 383 ("[Detective Easter] testified that the weapon was *extremely short* compared to a normal shotgun. Detective Easter explained that he removed the shotgun from the vehicle because he knew that it was *much shorter* than the length of a normal shotgun.") (emphasis added); *Wade*, 30 F. App'x

at 369 ("The record before us here includes [sic] a photograph of the shotguns in question. The photograph clearly shows (because an eighteen-inch ruler is placed atop the weapons) that the barrels of all three were *significantly shorter* than eighteen inches.") (emphasis added). The running motif in these cases is that the barrels of the sawed-off shotguns were significantly shorter than those of legal shotguns. Based on the obvious disparity in length between the sawed-off shotguns and legal shotguns in these cases, the Sixth Circuit has repeatedly held that the incriminating nature of the sawed-off shotguns was immediately apparent.

**a**

Here, that Sixth Circuit precedent applies to the shotgun seized. According to the testimony of Agent Murphy, the shotgun was visible in gun rack behind the counter. A member of the Bay City Police Department noticed the shotgun first, and he drew Agent Murphy's attention to it. Agent Murphy then testified that, upon visual inspection, the shotgun barrel appeared very short. As in the previously cited Sixth Circuit cases, this is an instance where the shotgun barrel appears much shorter than the federal minimum of 18 inches, and therefore its incriminating nature was immediately apparent. Therefore, the appearance of the shotgun gave Agent Murphy probable cause to believe that the shotgun was illegal, and this factor weighs against suppression of the shotgun.

**b**

In contrast, the rifle's incriminating nature was not immediately apparent because it was not substantially shorter than the minimum requirements. Agent Murphy testified that, looking at the rifle in the gun rack, it would be a close call as to whether the rifle barrel was too short. Agent Murphy admitted that the barrel length could even be right on the cusp of legality.

Because the rifle barrel *might* have been too short, Agent Murphy attempted to measure the length of the barrel attachment. Upon measurement, he discovered that the barrel was detachable. With the barrel extension in place, the barrel length complies with all statutory requirements. Only when the barrel extension is removed does the rifle violate federal law. Here, then, the criminal nature of the rifle was not immediately apparent because it was not even immediately apparent that the rifle was a sawed-off rifle. *See United States v. Szymkowiak*, 727 F.2d 95, 99 (1984) ("When an expert in the firearms field is unable to associate discovered evidence with criminal activity without actually dissembling the evidence, [a court] can hardly say that probable cause would be 'apparent' to an officer of 'reasonable' caution from the evidence itself."). Accordingly, the second factor weighs in favor of suppression of the rifle.

**c**

In summary, Sixth Circuit case law has provided that when the barrel of a sawed-off firearm is much shorter than the federally mandated length, its incriminating nature is immediately apparent. Therefore, given that Agent Murphy described the 14.5-inch shotgun as being very short compared to the required 18 inches, its incriminating nature was immediately apparent and this weighs against suppressing the shotgun.

In contrast, the Stag Arms rifle only failed to meet the federal minimum length when its barrel was detached, and therefore its incriminating nature was not immediately apparent. This factor, then, weighs in favor of suppressing the rifle.

**ii**

In contrast to sawed-off shotguns, the Sixth Circuit has held that the incriminating nature of automatic weapons is not immediately apparent. *United States v. Tatman*, 397 F. App'x 152, 175-77 (6th Cir. 2010) (finding incriminating nature of automatic weapons parts kit not

immediately apparent); *Szymkowiak*, 727 F.2d at 99 (suppressing assault rifle where the officers could not tell by looking at the rifle whether it was automatic). As Agent Murphy admits, it is not illegal to be in possession of a machine gun—federal law only prohibits the possession of certain types of machine guns. Therefore, the illegality of the machine gun parts kit is not immediately apparent, and this factor weighs in favor of suppression.

## C

The third factor concerns whether the officer, at the time of the discovery of the object and with the facts then available, can determine probable cause of the object's incriminating nature.

### i

As discussed above, the incriminating nature of the shotgun was immediately apparent to Agent Murphy because it was almost four inches shorter than the federal minimum. Accordingly, based on visual observation only, Agent Murphy believed he had probable cause to know of the firearm's incriminating nature. Another ATF agent then measured the barrel by inserting a dowel rod down the barrel and using a tape measure; the shotgun barrel measured about 14.5 inches. That another agent used a dowel rod and measuring tape to confirm the barrel's illegal length does not alter the analysis. At least one other court has clarified that law enforcement could use a tape measure to confirm the suspicion that a barrel length was too short: "The deputies saw the shotgun in plain view, and noticed, given the short length of the barrel, that it was not legal to possess; a quick application of a tape measure confirmed that suspicion." *United States v. Swilley*, 2013 WL 663727, at *5 (N.D. Ga. Feb. 1, 2013). Accordingly, given the facts available to Agent Murphy at the time, there was probable cause to believe that the shotgun was illegal.

**ii**

However, law enforcement did not have probable cause to believe the rifle was illegal. Agent Murphy admits that, just by looking at the rifle, he was unable to tell whether its barrel length complied with federal law. Indeed, the agents did not even know if the barrel was detachable in the first place. Rather, the agents had to first determine that the barrel was detachable, and then they had to measure the barrel. Thus, probable cause did not exist at the time the agents initially observed the rifle. It is well-settled that where "an item appears suspicious to an officer but further investigation is required to establish probable cause as to its association with criminal activity, the item is not immediately incriminating." *Tatman*, 397 F. App'x at 175. Because law enforcement needed to investigate whether the barrel was detachable before determining that the barrel length was too short, they did not have probable cause to believe that the rifle was immediately incriminating. Therefore, this factor weighs in favor of suppressing the rifle.

**iii**

With respect to the machine gun, law enforcement did not have probable cause to believe that the parts kit was illegal. Agent Murphy explains that the kit was found in a clear plastic bag beneath the counter. Because it was dark underneath the counter, Agent Murphy admits that he could not initially tell whether the bag contained machine gun parts or a handgun. After retrieving the plastic bag, Agent Murphy explained that he thought that it was possible that it contained parts for a machine gun, and therefore he sent pictures of the bag to the Firearms Technology Branch. After review, the Firearms Technology Branch contact confirmed that the plastic bag contained machine gun parts.

Most importantly, Agent Murphy admitted that, even at the time he sent the photos to the Firearm Technology Branch, he did not suspect that the machine gun parts were illegal. Rather, he wanted to confirm that the parts could be assembled to make a machine gun. By his own admission, Agent Murphy did not suspect that the (possible) machine gun was illegal. Therefore, Agent Murphy did not have probable cause to believe that the machine gun parts kit was illegal when he found it underneath the counter. This factor weighs in favor of suppression of the machine gun parts kit.

### D

The fourth factor concerns whether the officer can recognize the incriminating nature of the object as the result of his instantaneous sensory perception, as opposed to further investigation.

As described above, Agent Murphy was able to tell, based solely on a visual inspection of the shotgun in the gun rack behind the counter, that the shotgun's barrel was too short to meet the federal minimum requirements. Because law enforcement was able to tell that the shotgun was illegal based on instantaneous visual perception, this weighs against suppression of the shotgun.

The incriminating nature of the rifle, however, was not based on instantaneous sensory perception. Agent Murphy—admitting that he could not tell whether the rifle barrel was too short based on a visual inspection—had to remove the rifle from the gun rack, examine whether the barrel was detachable, and then measure the barrel length without the extension. This investigation illustrates that the incriminating nature of the rifle was not based on instantaneous sensory perception, and therefore this weighs in favor of suppression of the rifle.

Moreover, Agent Murphy could not tell, based on his instantaneous sensory perception, that the plastic bag contained illegal machine gun parts. He admits that it was too dark underneath the counter to tell what was in the plastic bag—he could not even tell whether there was a handgun in the bag at that point. Accordingly, based on his instantaneous sensory perception, Agent Murphy could not determine that the plastic bag beneath the counter contained illegal contraband. Therefore, this factor also weighs in favor of suppression of the parts kit.

### E

In conclusion, the four *Garcia* factors weigh against suppression of the shotgun, but weigh in favor of suppression of the rifle and the machine gun parts kit. The incriminating nature of the shotgun was immediately apparent, but this is not true of the rifle and the machine gun parts. Because only the incriminating nature of the shotgun was immediately apparent, it is the only firearm subject to the plain view exception. Accordingly, shotgun will not be suppressed. However, the rifle and the machine gun parts kit are not subject to the plain view exception and will be suppressed.

In response to Lijewski's motion to suppress, the Government contends that seizure of the firearms was permissible because law enforcement could handle and manipulate the firearms because they were searching for marijuana and flash drives—items specifically enumerated in the search warrant. The Government explains that the contraband could even have been hidden inside the firearm barrels or in the plastic bag of machine gun parts.

But the Government does not explain why the extensive manipulation of the rifle and machine gun parts was necessary. For example, Agent Murphy testified that—in theory, at least—the rifle barrel extender could have concealed contraband. But, as Agent Murphy admitted, he was not even sure that there *was* a barrel extender on the rifle until he attempted to

twist the barrel. And the only reason Agent Murphy attempted to remove the barrel extender is because he was searching for illegal firearms; he admits that he was not looking for marijuana or flashdrives when he attempted the removal of the barrel. As made clear by Agent Murphy, at no time was law enforcement looking for concealed contraband in the rifle and at no time did law enforcement believe that the rifle contained contraband. Therefore, the fact that after extensive manipulation of the rifle, the officers retroactively concluded that it was theoretically possible that contraband could have been concealed by the attachment is insufficient.

Nor does the Government explain how contraband could be discovered by photographing the machine gun parts and then sending them off to the lab—absent any suspicion by the ATF agent that the resulting machine gun would be illegal. The fact that law enforcement was looking for small items such as drugs and flash drives does not allow them to manipulate the rifle and the machine gun to the extent they did.

**IV**

In summary, the affidavit underlying the search warrant of Lijweski's gun shop is supported by probable cause. Based on the totality of circumstances, the affidavit provided sufficient factual information to establish a nexus between the alleged criminal activity and the place to be search.

Moreover, although the shotgun seized during the execution of the search warrant was not covered by the warrant, it is subject to the plain view exception. Therefore, Lijewski's motion to suppress the Stag Arms shotgun will be denied.

However, because the Stag Arms rifle and machine gun parts kit were not covered by the plain view exception, they must be suppressed. Lijewski's motion to suppress these firearms will therefore be granted.

Accordingly, it is **ORDERED** that Defendant's Motion to Suppress Search Warrant (ECF No. 12) is **GRANTED IN PART AND DENIED IN PART**. The Stag Arms rifle and the machine gun parts kit seized from GunRunners will be **SUPPRESSED**.

s/Thomas L. Ludington  
THOMAS L. LUDINGTON  
United States District Judge

Dated: August 8, 2014

---

PROOF OF SERVICE

The undersigned certifies that a copy of the foregoing order was served upon each attorney or party of record herein by electronic means or first class U.S. mail on August 8, 2014.

s/Tracy A. Jacobs  
TRACY A. JACOBS